743 A.2d 281

Lynn L. LONG

v.

Melvin C. LONG, Sr.

No. 52, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Jan. 3, 2000.

T. Joseph Touhey, Glen Burnie, for appellant.

John A. Blondell, Glen Burnie, for appellee.

Argued before THIEME, ADKINS and JAMES S. GETTY (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

Lynn L. Long ("Wife") brings this appeal on a ruling by the Circuit Court for Anne Arundel County regarding property and alimony issues for a divorce action filed over three years ago. Wife filed her initial complaint for absolute divorce on November 15, 1996. Melvin C. Long, Sr. ("Husband"), answered and filed a counter-complaint on December 6. Discovery proceedings took up 1997. After a three-day trial ending on January 2, 1998, the parties submitted proposed findings of fact and trial memoranda.

In a memorandum opinion dated August 31, 1998, the chancellor made his findings of fact, and the court granted Wife a divorce based on Husband's adultery. The court awarded Wife a monetary award of slightly less than 20 percent of the total marital property, but denied Wife's request for indefinite alimony. Instead, it granted her rehabilitative alimony for four years. It also awarded Wife $6,000 in attorney's fees. Wife filed a motion for clarification of judg-

ment in September 1998, and, after a hearing on December 9, the chancellor issued a memorandum opinion on February 12, 1999. The court declined to alter the other awards, but increased Wife's attorney fees to $20,000. She now appeals and presents questions two through five that follow. Husband counter-appeals on question one.

1. Did the trial court err in its valuation of Husband's business?

2. Did the trial court err when it found that the entire increase in the value of Husband's business was marital property?

3. Did the trial court err when it granted Wife a monetary award of less than 20 percent of the marital property?

4. Did the trial court err or abuse its discretion, given Wife's age, employment history, and medical condition, when it denied her request for indefinite alimony and instead awarded her alimony of $3,000 per month?

5. Did the trial court err in failing to award Wife a share of Husband's pension fund?

We answer "no" to the first, second, and fifth questions and "yes" to the third and fourth, and we explain.

## Facts

### A

#### Background Information

Husband and Wife, both age 52, were married in Dallas, Texas, on February 14, 1988. It was a second marriage for both parties. No children were born of the marriage, although both parties have children from their previous marriages.

Wife resided in Dallas, where she lived for approximately 20 years, at the time she met Husband there. Before her marriage to Husband, she owned an automotive touch-up business for approximately 15 years, and she also helped her former husband establish a business. She has three children,

now adults, from her first marriage. She was in the process of a divorce from her former spouse when she met Husband.

Husband, who had founded a commercial photographic processing business, Photographic Processing, Inc. ("PPI"), in Maryland with his then-estranged wife in 1969, had moved to Texas to start a new business. There, he entered into a partnership with Sheila White, Wife's close friend, who was also engaged in photo processing. The business venture did not succeed, but after Ms. White's introduction, Husband married Wife on February 14, 1988. Eventually, Husband and Wife, together with Wife's two daughters, moved to Maryland.

Husband had retained an interest in PPI, and on December 15, 1988, he bought out his ex-wife's 500 shares of PPI stock for $250,000. At present, Husband's business continues to make payments on that purchase and will do so until 2004. Two years later, Husband filed documentation with the State to change the name of PPI to "MCL Holding, Inc." At the time, he also applied to form a new corporation called Photographic Processing, Inc. ("PPI/MCL") No assets were acquired by PPI/MCL at that time. During testimony, Husband stated that the reshuffling of business names and assets was for estate planning purposes. The new corporate entity continued to grow during the marriage.

Before and during the marriage, indeed from his childhood, Husband has avidly collected model trains, a past-time in which Wife also participated during the marriage, by frequently attending model train shows and conventions with her husband and manning the family display table. Husband estimated the value of his extensive collection to be $200,000, based on a recognized evaluation tool, but Wife's estimator calculated that the collection was worth $406,428. The train collection is not insured, and there exists no inventory or valuation pre-dating those prepared for trial.

At trial, Husband sought to convince the chancellor that he already owned 95 percent of the present collection at the time of his marriage to Wife. He could produce no records,

receipts, log books, inventories, or even specific recollections of his purchases to substantiate his claim. He insisted, however, that the numerous boxes of trains in his collection followed him from Maryland to Dallas and back again. Wife, her daughters, and a family friend testified that the collection at the time of the marriage consisted of eight to ten boxes of trains occupying one corner of one small bedroom. Husband recounts that he moved to Dallas using his Lincoln automobile to tow a U–Haul trailer. Husband and his children claimed that he moved 65 to 75 boxes of trains in that trailer and that the trains occupied a full bedroom in the family home. Another witness and fellow collector, Ron Borsella, testified that Husband's train collection in 1985 was quite large and opined that a train collection close to the 1985 size or present size would not fit into the largest U–Haul trailer available. Whether Husband sold a significant number of trains during his first marriage, temporarily diminishing the size of his collection, is unclear; however, he did testify that two of his automobiles were purchased using proceeds from pre-marital train sales.

Wife's mental health was also an issue at trial. Wife testified that she suffers from agoraphobia, a mental disorder characterized by abnormal fear of open spaces, public places, and the out-of-doors. She claims to have suffered from this malady for 20 years, and that the disease has affected her life, marriage, and ability to engage in normal employment, social affairs, and such everyday activities as driving a car for any significant distance or time. Agoraphobia is associated with severe or recurrent major depression, fear of contact with unfamiliar people or places, and panic disorder.

Wife testified that she has been in treatment with a psychiatrist and a psychologist for years and that she must take larger-than-prescribed doses of medication to engage in any outdoor activity or even to drive. Wife's expert witness and treating psychologist, Dr. Scott Smith, testified that Wife's phobia predated the marriage. Her condition has varied over the years and, at present, she is healthier than she has been at some points in the past. Dr. Smith testified, however, that

her illness was likely to continue indefinitely and will probably prevent her future employment. He has recommended that she apply for Supplemental Security Income.

Husband acknowledged Wife's mental health problems during his deposition on April 4, 1997, but at trial he sought to minimize his knowledge of her condition, contending that she does not suffer "one bit" from any debilitating condition. He and his witnesses pointed out that Wife has held various jobs and traveled by air to visit family members, has attended conventions, family outings, and company functions with Husband, and has taken vacations. He also presented evidence of Wife's trips to shopping malls, exercise studios, and church, including photographs of her driving a car. According to her psychologist, however, part of Wife's treatment plan includes efforts to leave the house and engage in various activities.

Wife's employment history, in contrast, has been spotty. Although she worked in a photographic laboratory immediately after her marriage, she had not been employed for several years before this litigation. At the request of Husband, Wife gave up her automotive touch-up business in Texas. After moving to Maryland, she initially tried to open another touch-up company but, in her words, the laws are "different here" than in Texas and she failed to turn a profit. She obtained a job at Gantos in Marley Station Mall, but soon quit. Later, a friend offered, and she accepted, a job managing a Frederick's of Hollywood store at the same mall. She soon quit that job as well. She also worked for a mortgage banking company in Rockville, and she has maintained a cosmetology license for 29 years. Wife testified, however, that Husband requested that she not work, because she "was costing him money." [1] Wife has also never worked for PPI/MCL, having been barred from association with the company by an agreement between Husband and his ex-wife, Sharon Long.

At the time of the trial, Husband was paying $3,000 per month to wife under a *pendente lite* order, in addition to

---

1. Presumably, her employment created additional tax liability.

paying the monthly mortgage on the marital home in Pasadena. The parties owned six vintage vehicles and home furnishings valued at $60,000. Husband has a $500,000 life insurance policy with Great Western, the current value of which is $8,578.48. In addition, he owns a pension, described as the "PPI Money Purchase Plan," to which he has contributed since 1974. It is undisputed that assets and interest were added to the pension plan during the marriage. Wife owns some jewelry, including a $6,000 diamond ring and a $10,000 replacement stone for her wedding ring, along with china and crystal.

At separation, Wife took sums in the joint checking accounts for her own use. She also made use of a bank credit line for $10,000. Wife considered these sums, totaling $54,000, as necessary for living expenses and divorce litigation costs.

The trial court ultimately dissolved the marriage because of Husband's adultery. Husband asked Wife for a divorce on October 19, 1996. The parties separated on October 22, when Wife, who had suspected that Husband had multiple adulterous affairs, insisted that he leave the marital home. When confronted with surveillance reports by private investigators, Husband did not deny at trial that he had an extramarital affair. He admitted at trial that his testimony about adultery at his April 4, 1997, deposition had been false; thus, he admitted his perjury. Also, Husband's business is making payments on a $60,000 settlement of a sexual harassment suit which was brought against the business and against Husband by several female employees as a result of his unwanted sexual advances. That suit was filed in February 1996 and settled in February 1997.

## B

### The Trial Court's Opinion

In its memorandum opinion, the court valued the following property for the purpose of isolating the marital assets:

i) PPI/MCL—$340,005.00, representing the increase in value of the business during the marriage as established by Wife's expert, Brace Hushes;

ii) PPI Money Purchase Plan—$102,649.12;

iii) Marital residence—$243,500.00; and

iv) Train collection—$406,428.00.

The court found the train collection to be marital property, as well as the entire increase in the value of the business since the marriage, and the pension plan. The total value of all marital property, including the items stated and vehicles, jewelry, furnishings, and bank accounts, was determined to be $1,135,103.33. Of this, the court found that $275,471.21 was jointly titled, $849,282.12 was titled in Husband's name, and $10,350.00 was titled in Wife's name.

With respect to Husband's business, the court found that he had transferred the interest in PPI to another corporation he established, PPI/MCL, and that this transfer occurred during the marriage. It adjudged that "no new assets were added when PPI was re-incorporated and that the re-incorporation was for estate planning only." The court also determined, however, that the increase in value of the corporation as it existed at the time of the marriage to the time of the divorce would be considered marital property, because, in part, of Wife's care for the marital home while Husband worked long hours in the business.

To arrive at the amount of the increase, experts calculated the value of PPI/MCL both before and after the marriage. PPI/MCL was valued at $670,750 by Wife's expert, based on a review of normalized earnings over a five-year period. Under the normalized earning formula, Wife's expert testified that the value of the business in 1988 was $330,745. In the alternative, Wife's expert found that the business was worth $742.365 at the time of trial, based on three-year normalized earnings. Husband's expert testified that the pre- and post-marriage values of the business were $310,778 and $430,921, respectively. The chancellor held that Wife's five-year valuation was the most accurate estimate and determined that the

business had increased in value by $340,005 during the marriage. Thus, the portion of the business attributable to marital property was $340,005.

As for the train collection, the court took note of Husband's failure to substantiate or document the details of his acquisition of this extensive collection and concluded (citations omitted):

> Inability to trace property acquired during a marriage directly to a non-marital source means that all property acquired was marital. If a spouse chooses to commingle marital and non-marital funds to the point that direct tracing is impossible, his or her property may lose its non-marital status. This Court finds that this analysis applies in the present case. [Husband] commingled the train collection to the point that direct tracing is impossible. He kept no record as to which trains he acquired prior to the marriage and which were obtained during the marriage. Therefore, this Court finds that the entire collection is marital property.

As for the other assets, the court found that the PPI Money Purchase Plan was worth $273,731. The marital share was found to be $\frac{3}{4}$ ths, or $102,649.12. It accepted Wife's valuation of $243,500 for the marital home and determined that sum to be part of the marital assets.

The court noted that Wife sought a monetary award of $413,423.24. It first reviewed the monetary factors cited in Maryland Code (1984, 1999 Repl.Vol.), § 8–205(b) of the Family Law Article. It then noted Wife's circumstances, specifically, that she had not worked for any length of time outside the home; that she had in her own name only $10,350 of marital property totaling more than $1 million; that she was "currently ... unable to work outside the home to earn any income"; that she had a high school education; that the nine-year marriage failed because of Husband's adultery; that she presently suffered emotional distress over the breakup of her marriage; and that she suffers from agoraphobia. The court also referenced other statutory factors, such as the age of the

parties, before concluding without any explanation that Wife was entitled to $225,000, about half the monetary award that she sought and less than one-fifth of the marital property.

Turning to alimony, the court likewise reviewed the circumstances and factors relating to an award of alimony. The court noted that Husband's salary from the business is about $150,000 per annum, whereas Wife is unemployed and has no income. Further, Wife lives in a home valued at over $230,000, and her monthly expenses are $1,800. She has no pension. Husband's monthly expenses are $7,290, including mortgage payments of $1,730 per month, from a net income of $9,020 per month. As to other factors, including Wife's ability to be self-supporting, the court said, "Her ability to acquire and maintain a job outside the home is questionable because of her alleged bouts with agoraphobia. She is in therapy, however and has been successful at jobs before."

Although the court pointed out that indefinite alimony was sometimes indicated when the parties' standards of living after a period of rehabilitation will remain unconscionably disparate, it did not award Wife indefinite alimony. Instead, citing her history of employment and demonstrated job skills, it found that she could likely earn over $2,000 per month and enjoy a standard of living comparable to the one she enjoyed during marriage. Without further reasoning, the court concluded that the parties' respective standards of living would not be unconscionably disparate, and it awarded rehabilitative alimony in the amount of $3,000 per month for four years.

Finally, the trial court awarded $6,000 in legal fees to Wife, noting that of the $54,000 she had withdrawn from marital bank accounts, over $35,000 had been used for legal expenses.

## C

### Revisory Motion and Opinion

Following the court's opinion of August 31, 1998, with an accompanying Judgment of Divorce, Wife sought clarification of the court's opinion. Husband filed a response. The court

reconsidered the matter and denied Wife's motion, except that it increased her award of attorney's fees from $6,000 to $20,000.

The court stated that the monetary award was "fair and equitable," considering such factors as the "economic circumstances of the parties, the relatively short duration of the marriage and how and when specific marital property was acquired." As for the train collection, the court stated that, although it was marital property, "there is no doubt that [Husband] is the owner of the collection." Under section 8–202(a)(3) of the Family Law Article, the court further said that it was unable to transfer "ownership of personal property, including marital property, from one party to another" and "absent the consent of the parties . . . may not order the sale of property owned solely by one spouse with the proceeds going to the other." It thus would not split or require sale of the trains to augment Wife's monetary award.

Likewise, the court declined to award any portion of the pension plan to Wife, even though the plan was found to be part of the marital property. Wife had asked the court about the manner and method of distribution for the plan. The court responded, "The value of the marital portion of the PPI Money Purchase Plan (the pension) was included in the total value of the marital property titled in [Husband's] name. Furthermore, the value of the pension was considered in the calculation of [Wife's] monetary award. Consequently, this Court will not mandate that [Wife] be awarded a portion of the pension plan upon [Husband's] retirement." Both parties noted timely appeals from those determinations.

### Discussion

In matters related to the distribution of marital property and the payment of alimony, we generally give the chancellor's findings broad discretion. He or she has the opportunity to assess the demeanor of witnesses before the bench and weigh the various financial statements and other documents each party brings to court. On review, we "assume the truth of all evidence tending to support the findings

of the trial court, and ... simply inquire 'whether there is any evidence legally sufficient to support those findings.' " *Skrabak v. Skrabak*, 108 Md.App. 633, 650, 673 A.2d 732 (quoting *Weisman v. Connors*, 76 Md.App. 488, 500, 547 A.2d 636 (1988)), *cert. denied*, 342 Md. 584, 678 A.2d 1048 (1996). Yet when the chancellor's stated findings of fact, *i.e.*, the evidence the court accepts as true for controverted issues, conflicts with the ultimate award of property and maintenance, we must take a closer look. We do so here, and we now question whether the chancellor's findings of fact support his conclusions. We will vacate the specific provisions of the Judgments of August 31, 1998, and February 12, 1999, and we remand this case to the trial court for additional proceedings consistent with this opinion.

# I

## Monetary Award

■ We first treat all questions pertaining to marital property, since all of them relate to the same issue, the overall distribution of that property by means of a monetary award. We evaluate each of the chancellor's findings for clear error only. If there is any basis in the record for reaching a given finding, we allow that finding to stand.

## A

## Valuation of Husband's Business

As for the valuation of Husband's business, we find that Husband does not show that the chancellor clearly erred in accepting Wife's calculations, nor did the chancellor err when, according to Wife, he wrongly attributed to marital property only the growth in the business since the marriage. The chancellor found the marital property share of PPI/MCL to be $340,000, which is the difference between the current value of the companies, $670,750, and the value of the predecessor company in 1987, $330,745. Wife's expert CPA, using capitali-

zation of earnings methodology for a five-year period, presented the valuation accepted by the court at the trial.

Husband argues that the court's basis for determining the marital portion of the asset was wrong. First, using the "excess earnings" methodology, his CPA testified, and Husband maintains, that the company's growth in value was only $119,513. Husband also contends that the remaining debt to his ex-wife diminishes the company's value, a factor not specifically considered by Wife's expert. Second, Husband argues that the chancellor wrongly attributed *any* of the business's value to marital assets, because i) Husband established the current company after the marriage for estate-planning purposes only, *i.e.*, its assets were purchased exclusively with stock from a predecessor business established 19 years before the marriage, and ii) no marital assets were used when Husband bought out his ex-wife's shares in predecessor business, *i.e.*, the corporation, rather than Husband himself, is paying off the debt created by the stock redemption. He claims in his brief that "the redemption debt [is] outstanding and not due to be paid in full until the year 2004," implying that the buy-out of his ex-wife's stock will actually post-date the divorce. Husband further contends that, because Wife did not participate directly in the affairs of the corporation and its repayment of the redemption debt, none of its significant increase in value should be attributed to marital property; that Wife "received the benefits of a good life" during her marriage should be quite enough.[2]

---

**2.** At some places in his briefs, Husband's bitter rhetoric about Wife exceeds reasoned debate on the issues. For example:

> Without assuming any expense but in addition to being supported, fed, clothed, medically treated and bejeweled, her monthly stipend for taking care of the home and "being there" during the 120 month term amounts to $5,192.00 per month.

Br. of Appellee and Cross Appellant at 23.

> Mel, like the Deus Ex Machina in the classic Greek tragedies, snatched Lynn and her children from their meager circumstances. She now wants the Court to compel him to continue his benevolence despite her failure to include in the evidence any contributions toward the marriage or any sacrifice on her part for the benefit of the

Husband's remarks about Wife's role, however, are somewhat disingenuous. First, if Wife had wanted a hands-on role at PPI/MCL, Husband's own agreement with his ex-wife would have barred her involvement. Second, at some point Husband asked Wife not to work at all, foreclosing her opportunity to add assets to the household fund which might have been used, indirectly, to help capitalize the company. Third, Wife actively managed the family home and even helped raise Husband's children from a previous marriage while they resided there, making it easier for Husband to devote long hours to growing the business. Wife was hardly the passive beneficiary of Husband's largesse; instead, she was an active partner in the marriage whose presence enhanced her husband's success in increasing the value of the business.

In turn, Wife argues that the *entire* value of PPI/MCL should be counted as marital property. She notes with suspicion that Husband provided *no* evidence to support his position that the renaming and re-incorporation of his company in 1990 was for the purpose of estate planning. Like Husband, Wife discounts a significant fact—that no marital assets were added at the re-incorporation of PPI/MCL. Husband's interest in the company prior to his ex-wife's redemption neatly traces back to the period before the marriage. *See* Md.Code (1984, 1999 Repl.Vol.), § 8–201(e)(3)(i) & (iv) of the Family Law Article; *Harper v. Harper,* 294 Md. 54, 80, 448 A.2d 916 (1982) (articulating the "source of funds" theory for property partly acquired using both marital and non-marital funds, that "a spouse contributing nonmarital property is entitled to an interest in the property in the ratio of the nonmarital investment to the total ... investment"). Further, there is no reason for the court to have believed that the reincorporation

marriage other than "being there." This is a very expensive price to pay for that esoteric benefit.
Resp. Br. for Cross Appellant/Appellee at 9–10. Aside from insinuating that his marriage was never more than a financial arrangement—something we find difficult to believe—Husband's crass hyperbole does nothing to shed light on the real legal issues of the case.

in 1990 would have been for any purpose *other than* estate planning. The reincorporation thus holds no legal significance in the calculation of marital property.

■ Instead, we find that the chancellor did not err in his valuation of the company and allocation to marital property. First, the strength of the methodology relative to the accuracy of the analysis performed by the expert is immaterial under the clearly erroneous standard of review. *Strauss v. Strauss,* 101 Md.App. 490, 509, 647 A.2d 818 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995). Under that standard, the chancellor has discretion to accept or reject evidence to arrive at valuations for determining marital property. *See Goldberg v. Goldberg,* 96 Md.App. 771, 780, 626 A.2d 1062, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993). "Where, as here, there are two experts, the trier of fact must evaluate the testimony of both of them and decide which opinion, if any, to accept." *Quinn v. Quinn,* 83 Md.App. 460, 470, 575 A.2d 764 (1990).

As for Husband's contention about his company's indebtedness to his ex-wife, we note that business valuation is far more complex than the chancellor's unassisted efforts to place a price tag on other marital assets. That he would leave this task to experts is understandable. *Cf. Gravenstine v. Gravenstine,* 58 Md.App. 158, 180, 472 A.2d 1001 (1984) (holding that chancellor erred when he failed to subtract the debt owing on husband's truck from the purchase price). It was thus no abuse of discretion for the court to accept the valuation of one party's expert over the expert of the other, as both were grounded in fact. *See Fox v. Fox,* 85 Md.App. 448, 459, 584 A.2d 128 (1991) (holding that chancellor did not abuse discretion by accepting valuation of wife's expert, when the witness explained in detail how he arrived at his opinion and the court did not find his opinion devoid of reason or logic).

■ Second, our cases firmly support the chancellor's allocation of the company's growth during the marriage to marital property under the facts at hand. Although Husband owned in his individual capacity half of the shares of what is now PPI/MCL, the company's *ongoing* buy-back of the ex-wife's

shares has occurred after the marriage with funds generated during the marriage. Under section 8–201(e)(1), marital property "means the property, however titled, acquired by 1 or both parties during the marriage." Under *Harper v. Harper,* 294 Md. at 80, 448 A.2d 916, "acquired" means "the ongoing process of making payment for property." *Harper* goes on to say that "characterization of property as nonmarital or marital depends upon the source of each contribution as payments are made." *Id.*

Here, the funds used for the acquisition of the ex-wife's stock came from PPI/MCL's earnings during the marriage. Because Husband's control over the company is absolute, the same funds could have just as easily flowed into Long family bank accounts in the form of increased salary and bonuses. Wife contributed to Husband's success to the degree that she was able, so the funds must be considered marital property. *See Brodak v. Brodak,* 294 Md. 10, 25–27, 447 A.2d 847 (1982) (trailers added during the marriage to park that husband received from parents were marital property even though husband was sole proprietor, because wife had helped with business); *Fox,* 85 Md.App. at 456, 584 A.2d 128 (shares of capital stock in closely held firm acquired during marriage, even if company had been formed prior to the marriage for the eventual acquisition of shares); *Gravenstine,* 58 Md.App. at 174, 472 A.2d 1001 (entire value of stock purchased from dividends received from nonmarital stock was marital property, when both parties had decided to reinvest funds rather than use them for other purposes).

In his brief, Husband expounds at length on *Wilen v. Wilen,* 61 Md.App. 337, 348, 486 A.2d 775 (1985), claiming that the instant facts are a replay of that case. We find that the evidence adduced here distinguishes this case from *Wilen* and that the facts more closely resemble *Gravenstine* and *Brodak.* As in those cases, the parties here seem to have made a conscious decision regarding the parameters of Wife's role in the family business. Although Wife had work experience in a photography lab, Husband contracted with his ex-wife that Wife would play *no* role in the business. Further, the evi-

dence shows that Husband was sole stockholder, which gave him full authority to set his own compensation and the degree to which marital earnings would be reinvested in the business. *Wilen,* which describes the husband as the "salaried president" of his company, implies that the husband had no such authority. 61 Md.App. at 349, 486 A.2d 775. It was reasonable for the chancellor to infer that the Longs' decision to have Wife play a supporting role in the home was in fact like the Gravenstines' "conscious decision to reinvest the [investment] dividends instead of using the money for household needs." *Id.* at 348, 486 A.2d 775.

■ Furthermore, any additional increase in value of PPI/MCL during the marriage over and above the stock purchase must be considered marital property. In *McNaughton v. McNaughton,* 74 Md.App. 490, 538 A.2d 1193 (1988), we held that in determining the value of marital stock for a closely held corporation like PPI/MCL, trial courts must "take into consideration the fair market value of the corporate assets from the time the stock became marital property until the time of the issuance of the decree of divorce." *Id.* at 497, 538 A.2d 1193. Further, that increase in the value of non-marital business assets during the marriage may be considered marital property, when the spouse seeking that consideration shows that his or her non-monetary contribution allowed the other spouse to work harder toward the growth of the business. *See Brodak,* 294 Md. at 25–27, 447 A.2d 847. *Cf. Wilen v. Wilen,* 61 Md.App. at 348–49, 486 A.2d 775 (amount of increase in husband's non-marital investment holdings because of stock split properly was excluded from marital assets); *Mount v. Mount,* 59 Md.App. 538, 545–50, 476 A.2d 1175 (1984) (stock issued as a dividend that was directly traceable to shares of stock acquired by husband before marriage was properly excluded from marital assets). Wife shows and Husband admits that she managed the home and family while Husband worked long hours and that Husband was satisfied with the fact that she did not make a financial contribution to the marriage. We thus find no error in the chancellor's

allocating to marital property the increase in value of PPI/MCL.

## B

### Allocation of Husband's Pension

■ As for division of Husband's pension, we likewise find no clear error on the part of the chancellor. Wife asserts that the court below erred by not awarding her a portion of Husband's pension, the PPI Money Purchase Plan. The chancellor's initial memorandum opinion found the total value of the plan to be $273,731, and the marital share to be $\frac{9}{24}$ ths or $102,649.12, but it also found that funds from the marital share need not be distributed to Wife in the future because she "has no right to receive retirement benefits because she did very little work outside the home during the length of the marriage." When Wife asked the court for clarification, the chancellor refused to mandate that she be awarded a portion of the pension upon Husband's retirement, commenting that "the value of the pension was considered in the calculation of the [Wife's] monetary award."

■ Although the chancellor might have more thoroughly articulated his reasoning, the underlying award taken alone does not abuse discretion. When the right to receive retirement benefits is acquired during marriage, it is marital property subject to equitable distribution, even when only one spouse contributed economically to earn that right. *Deering v. Deering,* 292 Md. 115, 125, 437 A.2d 883 (1981); *Ohm v. Ohm,* 49 Md.App. 392, 399, 431 A.2d 1371 (1981). The statute governing the granting of monetary awards based on marital property states that "the court *may* transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from 1 party to either or both parties, grant a monetary award, *or* both, as an adjustment of the equities and rights of the parties concerning marital property...." Maryland Code (1984, 1999 Repl.Vol.), § 8–205(a) of the Family Law Article (emphasis added). The statute goes on to say that the trial court must consider:

[H]ow and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

§ 8–205(b)(11). The plain language of the statute thus gives the trial court much discretion in determining the best way to allocate marital assets between the parties. Whether to award retirement funds is but one of its options. If the court decides to award part of a retirement plan or similar account, it has considerable flexibility in determining how and when payments will be received. *See, e.g., Deering,* 292 Md. at 128–31, 437 A.2d 883 (describing "elastic approach" to awarding retirement benefits or similar annuities); *Caldwell v. Caldwell,* 103 Md.App. 452, 456–58, 653 A.2d 994 (1995) (awarding each party the full amount of the other's federal civil service employee survivor annuity benefit rather than the marital portion thereof was not an abuse of discretion).

In our view, however, flexibility and discretion do not equate to a mandate that every divorce litigant with a retirement account must share it with an ex-spouse. The retirement account or pension plan is often, next to the family home, a divorcing party's largest asset, so it may become necessary for the chancellor to keep the account on the table as an interest that may be divided. On the other hand, the retirement account here represents a fraction of the total marital property and of Husband's net worth. Other funds are available for a monetary award, and it seems fitting that the chancellor refrained from disturbing an asset in existence for 14 years before the marriage took place. Furthermore, Wife will receive a sizeable monetary award, some of which may be available as investment principal. Although the chancellor may ultimately award funds from the marital share of the retirement account when he adjusts the monetary award under this opinion, we find that his decision to let the account remain untouched was not *per se* erroneous.

## C

### Monetary Award

We find the bottom line award, however, to be in error. Although the chancellor's findings of fact show that he generally accepted the calculations of Wife's experts over those provided by Husband, the monetary award tilts lopsidedly in favor of Husband. The findings of fact show a vast chasm between Husband's and Wife's titled assets and the significant accrual of marital assets over the ten-year period of marriage, but the chancellor nonetheless awarded only $225,000 to Wife, or 19.8 percent of the marital assets. Wife had asked instead for 36.4 percent, or $413,423.24.

The chancellor's memorandum opinion reflected that he had considered all of the mandatory factors of section 8–205. We summarize his specific findings here:

- The chancellor found that Husband has "financially supported the family," but Wife "also has made significant contributions to the well-being of the family. Although she did not work much outside the home, she has made contributions to the family by taking care of the parties' home and being there for her husband." § 8–205(b)(1).

- He reiterated the value of all property interests and how they were titled. § 8–205(b)(2).

- With regard to the economic circumstances of each party, the chancellor pointed out that Husband earned 95.5 percent of the parties' income and that he has more work experience than Wife. "Throughout the course of the 10 year marriage, [Wife] stayed at home to make a home for the family. She rarely worked outside the home.... [S]he holds a high school education. By contrast, [Husband] holds a position in his company where he has worked for the last twenty-three years and earns approximately $12,500.00 per month." § 8–205(b)(3).

- He notes that Husband committed adultery, and "[b]y contrast, there has been little testimony that would support a finding that [Wife] had much to do with the break-

up of the marriage, except that [Husband] blames [Wife's] fear of crowds for limiting their activities together." § 8–205(b)(4).

- The marriage lasted about nine years. § 8–205(b)(5).
- Both parties were 51 years of age at the time of the divorce. § 8–205(b)(6).
- The chancellor addressed Wife's physical and mental condition, finding that she claimed to suffer short-term emotional distress because of the divorce and agoraphobia. § 8–205(b)(7).
- He listed the requirement of "how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party . . . ." § 8–205(b)(8). As he discussed each major asset elsewhere in the opinion, the chancellor included this information.
- The chancellor found that the parties' real property was purchased during the marriage, and, although Wife was not working at the time, she "has made non-monetary contributions to the family." § 8–205(b)(9).
- He noted that Wife will receive rehabilitative alimony. § 8–205(b)(10).
- He listed, but did not address, the "other factors" criterion from the statute. § 8–205(b)(11).

Of the largest assets on the table, the chancellor specifically refrained from making an award from Husband's pension fund from the marital share therein worth $102,649.12. He also found that Husband's collection of model trains, worth $406,428 according to Wife's expert and the court, grew considerably during the marriage. Because Husband kept no records as to the acquisition and disposition of trains, he noted that nonmarital and marital property had been commingled to the point where tracing was impossible. Thus, the entire collection was marital property. *See, e.g., Brodak,* 294 Md. at 27, 447 A.2d 847; *Melrod v. Melrod,* 83 Md.App. 180, 187, 574

A.2d 1 (1990) ("'Directly traceable' is not synonymous with 'attributable.' Since [husband] commingled his income from non-marital sources with his marital income, no specific sum of money used to acquire property ... can be directly traced to any source."). Nevertheless, in the memorandum opinion clarifying his earlier opinion, the chancellor wrote: "While the Court found the train collection to be marital property, there is no doubt that [Husband] is the owner of the collection." In the same breath, however, he noted that his hands were tied under Maryland Code (1984, 1999 Repl.Vol.), § 8–202(a)(3) of the Family Law Article,[3] and *Fox*, 85 Md.App. at 454, 584 A.2d 128 (holding improper the forced sale of property owned solely by one party and transfer of proceeds to other party in lieu of increasing monetary award), and he could not order the sale of trains belonging to Husband for the purpose of paying Wife.

▇ We cannot fault the chancellor's thorough treatment of the statutory factors, both in the original and clarification opinions. We do find error with the overall size of the monetary award in light of the findings of fact. Where the facts were controverted, the chancellor generally found Wife's evidence more credible than that of Husband, including her information regarding the acquisition and valuation of the train collection and valuation of the business. The chancellor noted that Husband was the source of the marital fault. He noted Wife's mental health problems, her present unemployment and lack of job training, and her non-monetary contribution to the marriage. Yet he awarded less than 20 percent of the marital assets to Wife, who held title to under one percent of those assets.

▇ The judgment here defeats the purpose of the monetary award, which is to achieve equity between the spouses

---

**3.** Section 8–202(a)(3) reads: "Except as provided in § 8–205 of this subtitle, the court may not transfer the ownership of personal or real property from 1 party to the other." Under section 8–205, the court may determine "the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan" from one party to another.

where one spouse has a significantly higher percentage of the marital assets titled his name. *See, e.g., Doser v. Doser*, 106 Md.App. 329, 348, 664 A.2d 453 (1995) ("The purpose of the monetary award is to correct any inequity created by the way in which property acquired during marriage happened to be titled."); *Strauss*, 101 Md.App. at 501, 647 A.2d 818 (purpose of Marital Property Act was to correct inequities created by husband's traditional role as breadwinner and wife's corresponding role of family caretaker); *Ward v. Ward*, 52 Md.App. 336, 339, 449 A.2d 443 (1982) ("The [statute's] clear intent is to counterbalance any unfairness that may result from the actual distribution of property acquired during the marriage, strictly in accordance with its title."). Although an equal division of the marital property is not required, *see Deering*, 292 Md. at 131, 437 A.2d 883, the division must nevertheless be fair and equitable. *See Ohm*, 49 Md.App. at 405, 431 A.2d 1371 (citing *Ward v. Ward*, 48 Md.App. 307, 426 A.2d 443 (1981)). To do otherwise is an abuse of discretion.

Here, we find that when the chancellor weighed the equities, he failed to give adequate force to his own findings about Wife's mental condition, unemployment, dearth of personal resources, real marital contribution, and lack of marital fault. Although no one factor outweighs another as a matter of law, our appellate courts have reversed trial courts for giving too little weight to important considerations. *See, e.g., Alston v. Alston*, 331 Md. 496, 629 A.2d 70 (1993) (reversing chancellor for giving inadequate weight to the eighth statutory factor, *i.e.*, the efforts of each party to earn the marital assets, where husband won controverted funds in Maryland Lottery during the separation period). With the train collection in particular, the chancellor found that the bulk of it was acquired during marriage and that Wife participated in the acquisition, yet the final award ensures that Husband can keep the collection intact while short-changing Wife of her benefit for the expenditure of marital resources. When the monetary award is weighed with the type and duration of alimony, the chancellor's judgment as a whole results in the unconscionable dispar-

ity between Husband's and Wife's post-marital status discussed in the next section.

Although the chancellor correctly cites law that prohibits court-ordered re-titling of personal property—and it seems a shame to cause even the partial sale of the world-class collection of model trains comprising 35.8 percent of the marital assets—we remind him that he has been granted all the discretion and flexibility he needs to reach a truly equitable outcome. Our statutes give him considerable discretion in balancing cash awards against alimony and future awards from retirement accounts. Even direct monetary awards need not be paid out in a single, up-front lump sum:

> If the court determines that the division of marital property based on title would be unfair, the court has several options. It may order a party to pay a fixed sum of cash and immediately reduce that order to judgment; it may establish a schedule for future payments of all or part of the award; it may transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from one party to another....

*Doser*, 106 Md.App. at 351, 664 A.2d 453 (citations omitted). *Cf. Strauss*, 101 Md.App. at 510, 647 A.2d 818 (requiring payment of monetary award "forthwith" was not abuse of discretion). We remand the monetary award for reconsideration, along with alimony, discussed *infra*.

## II

### Alimony

Likewise, the court's determination of the amount and duration of alimony to be awarded is inconsistent with its findings of fact. At trial, Wife sought indefinite alimony in the amount of $4,000 per month. In his memorandum opinion, the chancellor outlined the factors for mandatory consideration listed in Maryland Code (1984, 1999 Repl.Vol.), § 11–106(b) of the Family Law Article. He noted that paragraphs (4) through (9) and (11)(i) had been addressed in his discussion of the monetary award, and he applied the facts of the case to

each additional factor. We summarize the chancellor's findings here:

- He determined that Wife's ability to acquire and maintain a job outside of the home was "questionable because of her alleged bouts with agoraphobia," but she was receiving treatment and had been successful at jobs before. § 11–106(b)(1).

- He listed but did not address as it applies to Wife the requirement for "the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment." § 11–106(b)(2).

- The parties enjoyed an upper-middle class standard of living during their marriage, including Husband's $150,000 per year income, a quarter-million dollar residence, and several antique vehicles and other valuables. § 11–106(b)(3).

- The court was not aware of any agreement between the parties as to the amount and duration of alimony. § 11–106(b)(10).

- Wife received a monetary award of $225,000. § 11–106(b)(11)(ii).

- Wife's monthly expenses are about $1,800. She has no monthly income. Husband's net income is about $9,020 per month, or, minus the mortgage payment, $7,290. His monthly expenses are unknown. § 11–106(b)(11)(iii).

- Husband has retirement benefits through the PPI Money Purchase Plan. Wife has none. § 11–106(b)(11)(iv).

- Section § 11–106(b)(12) does not apply to this case.

The court then foreclosed indefinite alimony, stating:

[Wife] has a history of steady employment. She worked in the mortgage banking business and considers herself an expert in car valuation. Additionally, [she] has renewed her cosmetologist license each year. The Court finds that [she] is capable of acquiring some marketable job skills and of finding a suitable job earning at least $2,083.33 per month. [She] should be able eventually to earn enough to pay for

her monthly expenses and to enjoy a comparable standard of living [to] that she enjoyed while married to [Husband]. Furthermore, the parties were not married for a very long period of time.

Without further explanation, it awarded her rehabilitative alimony of $3,000 per month for four years, beginning in September 1998.[4]

This Court "will not disturb an alimony award unless the trial court has arbitrarily exercised its discretion or its judgment was otherwise wrong." *Doser*, 106 Md.App. at 351–52, 664 A.2d 453 (citing *Tracey v. Tracey*, 328 Md. 380, 385, 614 A.2d 590 (1992)). We will "accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings." *Tracey*, 328 Md. at 385, 614 A.2d 590 (citing *Rock v. Rock*, 86 Md.App. 598, 611–12, 587 A.2d 1133 (1991)). This Court finds no error or abuse of discretion with the chancellor's inference that Wife is at least somewhat capable of supporting herself. Although evidence of Wife's mental health problems was uncontested, Husband adduced significant proof that her agoraphobia, panic attacks, and depression did not totally bind her to the family home. Additionally, Wife has valuable work skills, including knowledge of automotive care and valuation and cosmetology, even if she lacks higher education and has not held a job for several years. Wife has experience in running a small business. *If* she is able to work and has a chance to make a go of it, Wife *might* in time become a successful small businesswoman again.

Or she might not. This is the concern of her psychologist, and our concern as well. We take issue with two aspects of the chancellor's findings as they stand. First, his opinion does not tell us why he reached specific findings. For example, we cannot ascertain from whence his determination on duration of alimony came, because he does not specifically treat the

---

**4.** Alimony was not an issue in the chancellor's opinion clarifying the judgment.

mandatory factor in section 11–106(b)(2), the time required for Wife to become wholly or partially self-supporting. While our cases hold that the chancellor need not treat section 11–106(b) as a formal checklist and list every factor in his opinion, *see, e.g., Crabill v. Crabill,* 119 Md.App. 249, 261, 704 A.2d 532 (1998), this element goes to the heart of Maryland's alimony scheme, which is based on rehabilitation. *See Holston v. Holston,* 58 Md.App. 308, 321, 473 A.2d 459, *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984). Its absence is especially noticeable because he treated the other factors in some detail. Likewise, the chancellor does not state from what evidence he determined that Wife can *retain* a job earning $2,083.33 per month, *i.e.,* $25,000 per year, given her current and projected mental condition.

Most of the facts he cited seem to point in the opposite direction of his judgment. A four-year alimony award might make sense, for example, if Wife was mid-degree program and needed time to finish a course of studies, and experts had testified that her anxiety and depression were temporary conditions. The outcome here might make sense if Wife, in sound mental health, had presented the chancellor with a business plan for establishing an auto detailing service or beauty salon with a profit of $25,000 per year projected for the four-year mark. Instead, the findings of fact show that the litigant before us is 52 years of age, has few assets, suffers from a mental health condition with an unknowable prognosis for full recovery, and has been out of the workforce, because of illness and perhaps at Husband's behest, for several years. The record shows, moreover, that she did not end her marriage by choice, but instead is divorced because Husband philandered. The facts of the story as determined by the court below thus do not match the parsimonious award it ultimately granted. *See Benkin v. Benkin,* 71 Md.App. 191, 204, 524 A.2d 789 (1987) ("we hold that there must be some relation between the length of the award and the conclusion of fact as to the income disparity made by the court"). Because the chancellor failed to draw a solid line between the facts and

the remedy, explaining fully how the former justifies the latter, he abused his discretion in our view.

Second, we remind the chancellor that, even if Wife's "age, illness, infirmity, or disability" are not enough to justify indefinite alimony, unconscionable disparity may well be, in light of the large discrepancy between Husband's long-term standard of living and that of Wife under the current monetary award. § 11–106(c). *See, e.g., Blaine v. Blaine*, 97 Md. App. 689, 632 A.2d 191 (1993), *aff'd*, 336 Md. 49, 646 A.2d 413 (1994) (indefinite alimony may be awarded to self-supporting spouse if there will be unconscionable disparity between the respective standards of living after the recipient spouse has made as much progress as possible in becoming self-supporting); *Doser*, 106 Md.App. at 354, 664 A.2d 453 (in deciding on indefinite alimony award, trial court must consider extent to which wife would earn an income comparable to the husband's salary). The policy of alimony is to give the dependent spouse "an appropriate degree of spousal support after the dissolution of the marriage." *Tracey*, 328 Md. at 388, 614 A.2d 590 (citing *Turrisi v. Sanzaro*, 308 Md. 515, 527, 520 A.2d 1080 (1987)). In Maryland, alimony is " 'not ... a lifetime pension,' " *Doser*, 106 Md.App. at 352, 664 A.2d 453 (quoting *Tracey*, 328 Md. at 391, 614 A.2d 590), but neither is it " 'designed to create a subsistence level for the more dependent spouse.' " *Id.* at 354, 664 A.2d 453 (quoting *Strauss*, 101 Md.App. at 512, 647 A.2d 818).

Here, we find the difference in Husband's and Wife's mid- to long-term prospects to be unconscionably disparate. Despite her knowledge of two or three useful trades and her business experience, Wife's present age, long absence from the job market, and mental condition will make it difficult, if not impossible, for her to achieve the court's predicted earnings potential. *See, e.g., Brashier v. Brashier*, 80 Md.App. 93, 560 A.2d 44 (upholding extension of alimony where wife suffered from severe anxiety, depression and agoraphobia, even though she had made significant progress and was able to engage in some activities outside of the home), *cert. denied*, 317 Md. 542,

565 A.2d 670 (1989); *Benkin,* 71 Md.App. at 203–04, 524 A.2d 789 (holding that chancellor's opinion did not adequately explain why wife's alimony should terminate after five years, when she would be 56 years old at termination, had been out of the job market for almost 25 years, and suffered from progressive arthritis). Wife had been married long enough to become accustomed to a heightened standard of living, and indeed she had helped Husband reach a level of prosperity. *See Holston v. Holston,* 58 Md.App. at 323, 473 A.2d 459 ("If the marriage has been of short duration and there was a great disparity in the standards of living prior to the marriage, it might not be unconscionable for the dependent spouse to be returned to his or her premarital standard of living.").

Even if the chancellor is right about Wife's income potential, it is unlikely that she will ever reach a standard of living anywhere near that which she enjoyed while married to Husband. Wife's self-sufficiency alone does not bar an award of indefinite alimony where an unconscionable disparity exists between the two parties' standards of living after the divorce. *See Tracey,* 328 Md. at 392–93, 614 A.2d 590. *See also Doser,* 106 Md.App. at 354, 664 A.2d 453 (citing several cases in which the serious discrepancy between the income of one spouse and another supported awarding indefinite alimony); [5] *Broseus v. Broseus,* 82 Md.App. 183, 196, 570 A.2d 874 (1990) (upholding indefinite alimony where wife lived at "a poverty-level standard" compared to husband even after she reached her earnings potential).

---

**5.** The cases cited in *Doser* include *Tracey,* 328 Md. at 393, 614 A.2d 590 (wife's income was 28% of husband's); *Blaine,* 97 Md.App. at 708, 632 A.2d 191 (same, with 22.7%); *Rock v. Rock,* 86 Md.App. 598, 609–13, 587 A.2d 1133 (1991) (same, with 22–30%); *Broseus,* 82 Md.App. at 196, 570 A.2d 874 (same, with 34.9%); *Bricker v. Bricker,* 78 Md.App. 570, 577, 554 A.2d 444 (1989) (same, with 34%); *Rogers v. Rogers,* 80 Md.App. 575, 592, 565 A.2d 361 (1989) (same, with 15%); *Benkin v. Benkin,* 71 Md.App. 191, 199, 524 A.2d 789 (1987) (same, with 16%); *Zorich v. Zorich,* 63 Md.App. 710, 717, 493 A.2d 1096 (1985) (same, with 20%); *Holston,* 58 Md.App. at 322–23, 473 A.2d 459 (same, with 15%); *Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208 (1983) (same, with 34%). *See also Cousin v. Cousin,* 97 Md.App. 506, 519, 631 A.2d 119 (1993).

Husband makes much of Wife's $225,000 monetary award. Her award, however, only places her long-term assets on par with Husband's current pension plan balance, if she can invest those assets and does not dip into them for day-to-day expenses. Even if she works and reserves the monetary award for her retirement years, the chancellor's $25,000 per year salary projection—not much above subsistence level in expensive suburban Maryland—is nowhere near the $150,000 Husband earns each year in his business. *See Wassif v. Wassif,* 77 Md.App. 750, 551 A.2d 935, *cert. denied,* 315 Md. 692, 556 A.2d 674 (1989) (finding unconscionable disparity and supporting award of indefinite alimony where wife was potentially self-supporting, but would earn only a fraction of husband's salary, even where both parties could liquidate real property and potentially generate a $500,000 nest egg for wife).

## III

### Comments on Remand

The chancellor must thus reconsider the amount and duration of alimony as he re-evaluates the amount of the monetary award. Our law weighs alimony and monetary awards against one another. *See, e.g., Strauss,* 101 Md.App. at 511, 647 A.2d 818 ("alimony and monetary awards are significantly interrelated"); *Rogers,* 80 Md.App. at 588, 565 A.2d 361 (holding that alimony and monetary awards are "interrelated and largely inseparable"); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 75, 502 A.2d 1068 (1986) ("It is thus patent that any disposition we might make with respect to the monetary award will most assuredly affect any alimony award made."). Chancellors thus may use higher alimony payments or payments over a longer or indefinite duration to equalize lopsided monetary awards and perhaps spare divorcing spouses from liquidating major assets like a pension plan or a cherished model train collection.

Furthermore, we remind the chancellor that indefinite alimony is not "permanent" alimony. On motion of either party, the court may revisit Wife's alimony payment periodically to

determine whether she has made enough progress to become reasonably self-supporting. Although most published cases treat increases in alimony or the extension of rehabilitative alimony to indefinite alimony, *see, e.g., Blaine v. Blaine,* 336 Md. 49, 646 A.2d 413 (1994), the court also has equitable discretion to reduce or even terminate alimony. *See* Maryland Code (1984, 1999 Repl.Vol.), §§ 11–107(b)[6] and 11–108[7] of the Family Law Article; *Turrisi,* 308 Md. at 528, 520 A.2d 1080 (holding that the chancellor may reserve alimony issues); *Jensen v. Jensen,* 103 Md.App. 678, 687, 654 A.2d 914 (1995) (allowing wife to pursue reinstatement of alimony 17 years after termination because of her unforeseen disability); *Wassif,* 77 Md.App. at 758, 551 A.2d 935 (holding that indefinite alimony is always subject to modification by the court should the income or circumstances of either party change significantly). As this Court wrote in *Hofmann v. Hofmann,* 50 Md.App. 240, 437 A.2d 247 (1981), "since the court retains jurisdiction to reconsider and modify alimony awards whenever a change in circumstances so warrants, alimony is not 'etched in stone.' At best, it is written in chalk on slate, subject to being erased by order of the appropriate court." *Id.* at 245, 437 A.2d 247. *See also Kennedy,* 55 Md.App. at 307, 462 A.2d 1208.

The chancellor also must revisit on paper the factor in section 11–106(b)(2) and review all factors in the context of re-evaluating the overall monetary award to ensure that the award is more in line with his findings of fact. As in *Benkin,* 71 Md.App. at 204, 524 A.2d 789, "we are not requiring the trial court to order an award of indefinite alimony, although that may be the ultimate conclusion of the trial court, after taking into consideration all the factors" set out in the statute.

---

6. This section reads: "Subject to § 8–103 of this article and on the petition of either party, the court may modify the amount of alimony awarded as circumstances and justice require."

7. This section reads in pertinent part: "Unless the parties agree otherwise, alimony terminates ... if the court finds termination is necessary to avoid a harsh and unequitable result."

Instead, we simply instruct the court below to award alimony in a manner congruent with its findings of fact.

**JUDGMENT AFFIRMED IN PART, VACATED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**