812 A.2d 1089

**Erle Harmer LEE**

v.

**Richard Paul LEE.**

No. 01308, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 20, 2002.

Russell P. Marks (Gilbert, Marks & Hadigian, P.A. on the brief) all of Hagerstown, for appellant.

Cynthia E. Young of Annapolis, for appellee.

Argued before SALMON, KRAUSER and SHARER, JJ.

SALMON, Judge.

The chancellor granted the appellant, Erle Lee ("Mrs.Lee"), an award of rehabilitative alimony in the amount of $1,500 per month for three years. He declined, however, to award Mrs. Lee permanent alimony. The main issue presented in this appeal is whether reversible error was committed by his failure to award permanent alimony.

## I.  *BACKGROUND FACTS*

A hearing was held on July 20–22, 2001, in the Circuit Court for Washington County. The focus of the hearing was to determine whether Mrs. Lee was entitled to indefinite alimony, and if not, the amount and duration of temporary alimony.

The appellee, Richard Paul Lee ("Mr.Lee"), conceded that Mrs. Lee was entitled to receive some temporary alimony.

Mrs. Lee was fifty at the time of the hearings. Mr. Lee is four years her senior.

The parties were married in 1972. Eight years later, they became parents of a son, Richard Paul Lee, Jr., who is now an adult college student. During the first fourteen years of marriage, Mr. Lee's employment responsibilities caused the family to move frequently, sometimes to areas—such as rural Alabama—which Mrs. Lee felt were undesirable.

Mr. Lee had four adulterous relationships during their marriage, the most recent of which was with a co-worker. He was involved romantically with the co-worker continuously from 1996 up until the July 2001 hearing.

In April 2000, Mr. Lee, unbeknownst to his wife, rented an apartment in Hagerstown, Maryland, where he met clandestinely with the co-worker. Despite paying rent for his "love nest," he continued to live in the marital home (also located in Hagerstown) with Mrs. Lee. On August 7, 2000, Mr. Lee left a note on the front door of the marital residence in which he bluntly informed his spouse that he was leaving her. The couple never cohabited thereafter.

During most of the twenty-eight-year period prior to their separation, the litigants lived in nice homes and enjoyed a comfortable, middle class standard of living.

Mrs. Lee filed, in the Circuit Court for Washington County, a complaint for absolute divorce or, in the alternative, for a limited divorce. She alleged that she was entitled to a divorce on the grounds of both adultery and desertion.

Mrs. Lee was granted a divorce on the ground of adultery. The chancellor found that Mr. Lee's adultery was responsible for the breakup of the marriage. The court also found that, during the marriage, Mr. Lee had transmitted a sexual disease to his spouse. As a consequence, Mrs. Lee now suffers from a painful rash that recurs monthly. While Mr. Lee also has the disease, he is asymptomatic.

Aside from suffering from the sexually transmitted disease, Mrs. Lee's physical health is good, as is Mr. Lee's. Mrs. Lee has suffered from anxiety and depression since the parties separated. She has sought, and received, professional help for these problems.

Mr. Lee was the primary source of family income during the parties' marriage. He has an Associate Degree in industrial engineering. He has worked in Hagerstown since 1984. Currently, he has a secure job as a plant manager for C.M. Offray and Sons, Inc. His annual salary in 2000 was $73,000. He also received a $5,000 bonus. In addition, his employer contributes to a 401K pension plan, and he enjoys company-sponsored health insurance and other fringe benefits.

Mrs. Lee, a high-school graduate, has attended community college, where she has earned a few college credits. She worked sporadically during the marriage but always at low-paying jobs. In 1996, she commenced employment in Hagerstown, where she worked as a veterinarian technician. Initially she worked part-time, but the position eventually evolved into a forty-hour-a-week job, paying $6.75 per hour. Mrs. Lee quit that job in 1999, due to "poor pay, poor management," and opened a "pet sitting" service. That venture was insufficiently remunerative, and to augment her income, she commenced employment in 1999 with Howard's Art and Frame store ("Howard's"). At Howard's she designs frames and matting for works of art. She also sews the mountings for antique textiles. Mrs. Lee worked forty hours a week and was paid $8.00 per hour at the time of the July 2001 hearing. This computes to $16,640 annually, assuming that she takes no vacations and works fifty-two weeks per year. Her employer provides her with no health or other fringe benefits.

Mrs. Lee has only minimal computer skills. She is a "two finger" typist and knows how to send and receive e-mail. She currently intends to work at Howard's because she enjoys the work and because her co-employees have provided emotional support since her husband's desertion.

In support of his position that Mrs. Lee was not entitled to indefinite alimony, Mr. Lee introduced, without objection, a report prepared by Kathleen Sampeck, a vocational consultant. Ms. Sampeck's assessment noted that Mrs. Lee had the following transferable employment skills:

1. speak[s] clearly and listen[s] carefully
2. use[s] personal judgment and specialized knowledge to give information to people orally
3. communicate[s] well with many different kinds of people
4. use[s] arithmetic to total costs and make change
5. use[s] office equipment such as a telephone, calculator, copy machine, fax machine, and computer keyboard.

Based upon these quotidian skills, the assessment listed several occupations for which Mrs. Lee would be qualified, namely: retail sales attendant, animal hospital clerk, reservation clerk, dispatcher, office helper, telephone operator, appointment clerk, receptionist, telephone quotation clerk, router, order filler, shipping clerk, and customer service representative. Using various sources, Ms. Sampeck opined that Mrs. Lee could earn "between $20,800.00 and $25,376.00 annually" if employed in one of the above-mentioned occupations.

In the Hagerstown area where Mrs. Lee planned to live, Ms. Sampeck believed that Mrs. Lee was qualified, at the below listed annual salaries, to work as: customer service representative ($16,400–$20,800); telephone survey worker ($16,952); order processor ($19,240); receptionist ($17,680–$23,800); dispatcher ($23,670); and companion ($18,720–$24,960). Her opinions as to possible job opportunities were "consistent with the average earnings of all persons with a high school diploma ($22,895) and those with some college but no degree [1] ($24,804)." The report also stated that estimate was "significantly lower than the average earnings of high

---

1. These figures, at least arguably, may overstate what Mrs. Lee is likely to earn because she entered the workforce at middle age, while, on average, most workers start younger and work longer.

school graduates between the age of 45 to 54 ($26,925) and those with some college but no degree, between the age of 45 and 54 ($35,090)." Ms. Sampeck's report noted, however, that "the median wage for an individual with Mrs. Lee's worker trait profile is $19,206."

The assessment concluded with these words: "Should Mrs. Lee elect to enhance her skills by taking some basic classes in using a computer, available through Hagerstown Community College, she would significantly enhance her job opportunities and earning potential." Ms. Sampeck did not venture an opinion as to what Mrs. Lee might earn if she "enhance[d]" her computer skills.

Shortly before the July 20, 2001, hearing, the parties amicably resolved all issues concerning marital property. Their agreement provided that the marital home was to be sold with the net proceeds divided equally. The parties anticipated that each would receive approximately $50,000 from the sale of the home. Investments, worth approximately $77,000, were to be equally divided. The value of some IRA's owned by the parties, coupled with Mr. Lee's 401K plan (with a combined value of $120,000), was also to be divided equally.

As a result of their agreement, both parties would have about $86,500 in either ready cash or stock once the house was sold, plus approximately $60,000 to be kept in reserve for their respective retirements. Mrs. Lee planned to use most of her share of the proceeds from the sale of the house to make a down payment on the purchase of another home.

The court found that Mrs. Lee's current monthly expenses were $2,600. According to Mr. Lee's financial statement, his monthly expenses were approximately the same as Mrs. Lee's.

## II. *OTHER FINDINGS OF FACTS BY THE CHANCELLOR*

The chancellor's findings of facts did not mention Ms. Sampeck's report. Aside from our summary of Ms. Sampeck's report and a few inconsequential details, the trial court's findings of fact were similar to those set forth in Part I

above. The chancellor found that Mr. Lee's annual salary was $75,000, plus a $5,000 bonus. The record reveals that his annual salary was $73,000, plus the bonus. Mr. Lee submitted a financial statement showing that his monthly expenses were $2,607.03. The trial judge did not, specifically, adopt that figure. Instead, when commenting upon the financial statements of the parties, he said:

> I mean we've got financial statements, there's errors in both of them, nothing intentional. We've got the blackboard with all these numbers, you know, and liars figure. Figures lie and liars figure. I think that's what they say. Not that anybody's a liar. And then, of course, we ... [must deal with that fact that] alimony is tax deductible to [Mr. Lee] and taxable to [Mrs. Lee], so that is something that has to be added into the mix.

The chancellor discussed, at least in some fashion, the first eleven factors mentioned in section 11–106(b) of the Family Law Article ("FL") of the Maryland Code (1999 Repl.Vol.).[2]

---

**2.** FL section 11–106 reads as follows:

**Same—Determination of amount and duration.**

(a) *Court to make determination.*—(1) The court shall determine the amount of and the period for an award of alimony.

(2) The court may award alimony for a period beginning from the filing of the pleading that requests alimony.

(3) At the conclusion of the period of the award of alimony, no further alimony shall accrue.

(b) *Required considerations.*—In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

Of particular importance to the outcome of this appeal are the court's comments in regard to the factors set forth in FL section 11–106(b)(1) and (2).

Regarding FL section 11–106(b)(1), the chancellor found that at the present time Mrs. Lee did not have the ability to be wholly self-supporting, although she was partially self-supporting. In the court's words, "She's not wholly self-supporting, because based on her needs, even if we racheted down her needs list . . . [s]he still needs additional funds from her husband to maintain somewhat [sic] a standard of living. I'll get into that in a minute."

Concerning the factors set forth in FL section 11–106(b)(2), the court said:

It would certainly not behoove me, if I were trying to say this is a rehabilitative alimony case to suggest to Mrs. Lee that, let's go out to the Junior College, I know there's money out there for "middle-aged, single women" to re-establish themselves in the job market. Because then you

---

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits; and

(12) whether award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

(c) *Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

can get yourself a two-year degree, and I think, quite frankly, I think when you were on the stand, you indicated it really didn't make sense at your age to get a two-year degree because, really, how much marketability will that be at the end of two years if I get that degree and I think you have a few [college] credits, but basically you're going to have to do this on your own time because you have to work so it would probably take you three or four years to get a degree, but I agree, I don't think that it's necessary for you to go back and get a degree in order to satisfy this criteria. The other argument is, no, but you're an intelligent woman, you've worked in the job market before, that it may be sufficient for you just to go out there and take a few courses for computers or whatever, in other words to hone up your skills to give you an added edge, if, in fact, you decided to leave the art gallery. And, who knows, jobs come up and nobody is here saying that, hey, you've got to go become a vet tech. I mean, you did apply for a job, they offered you minimum wage, I mean, nice try but, you know, you were smart enough not to take it so this isn't to say, look, you want alimony you're gonna have to get rehabilitative alimony, you have to go out there in the next couple of years and get some vet tech job. That's not what it's all about. So, yeah, I think, probably based on your age and education, there are some courses you can take, but I don't think it's reasonable to say that, look you ought to go out and get a degree.

It will be noted that, despite the chancellor's extensive comments regarding FL section 11–106(b)(2), he never gave his view as to the "time necessary for ... [Mrs. Lee] to gain sufficient education or training to enable ... [her] to find suitable employment."

The chancellor explained why he gave Mrs. Lee an award of rehabilitative alimony but no indefinite alimony in these words:

Now as far as the alimony is concerned, Mr. Marks [Mrs. Lee's counsel] nice try but I feel at this point we're at strictly in the rehabilitative alimony stage. This isn't to say

that later down the road she could [not] come in and request indefinite alimony, but I don't think we're there yet. I give her credit, you know, she … decided, from the Master's hearing until now, instead of working 30 hours a week she's working 40 hours a week. I'm not telling her to change jobs. I want to give her a suitable period of time to feel comfortable with what she's doing, to get this behind her, to instead of looking backward to look forward, and whether it's going to be at Howard's Arts or somewhere else, but I'll give her the ability to go out and, and try to take some additional courses, *give her the ability in a time to maintain a decent lifestyle* based on the settlement plus the alimony award and her income and, hopefully, this period of rehabilitative alimony will spring the bird from the nest, but we'll have to see. But I do not think that indefinite alimony is appropriate at this time. However, how long should the alimony be? And I agonized over this and looking at, again, the totality of the case, the statutory factors, and this isn't a penalty, but I don't think for a woman who's 54[sic] years old, based on her skills, based on a marriage of 27[sic] years, based on the fact that she does have ability to work, she's worked in the past but I mean to possibly enlarge her horizon for employment capabilities, I don't think it is inappropriate for me to order 36 months of rehabilitative alimony. That's three years, beginning August 1st.

(Emphasis added.)

The chancellor established the amount of rehabilitative alimony to be paid to Mrs. Lee by considering her living expenses—which were $31,200 per year—and her gross income of $16,640 ($320 per week × 52), less taxes. He concluded that if she were to receive $18,000 per year ($1,500 per month) in alimony, that amount, coupled with her wages, less taxes, would suffice to cover her needs. Accordingly, Mr. Lee was ordered to pay alimony in the amount of $1,500 per month.

### III.

Mrs. Lee asserts that the chancellor made four errors, *viz:*

1. Making no factual finding that would justify a period of rehabilitative alimony of three years, as opposed to any other time period.

2. Failing to make a determination pursuant to FL section 11–106(c)(2) of whether, after Mrs. Lee makes as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living will be unconscionably disparate.

3. Failing to recognize the heavy burden that Mrs. Lee would have to shoulder if she were to return to court after three years and ask for an award of indefinite alimony.

4. Failing to grant Mrs. Lee an award of indefinite alimony.

We shall address these allegations *seriatum.*

### A. *No Factual Findings to Justify Rehabilitative Alimony for Three years*

Mrs. Lee argues:

The court made no findings of fact that would justify a period of three (3) years, as opposed to one year or ten years, or some other figure. Nor did the court make an evidence-based prediction of what it expected would occur to the [a]ppellant during that three (3) year period, *i.e.,* a specific education plan, training, etc. Nor did the [c]ourt estimate what the [a]ppellant's income would be at the end of the three (3) years. Indeed, there was no evidence to support a conclusion that the [a]ppellant would be earning more money in 2004 than in 2001.

Citing *Benkin v. Benkin,* 71 Md.App. 191, 524 A.2d 789 (1987), Mrs. Lee asserts that the chancellor is required to make a prediction "regarding the dependent spouse's efforts to become self-supporting."

Mr. Lee acknowledges that, when a chancellor sets the duration of rehabilitative alimony, he or she "must" have "some factual basis for the choice of length of time for rehabilitative alimony, and some educational plan." He as-

serts, however, that Ms. Sampeck's report provides "ample" basis for the chancellor's choice. He contends that in choosing three years, the chancellor was evidently relying upon "Ms. Sampeck's statement that [a]ppellant would greatly increase her marketability by taking some computer courses."

Appellee goes on to argue:

There is nothing in [Ms. Sampeck's] report to indicate that [a]ppellant would benefit by pursuing a four year degree, and hence there is a foundation for the [c]ourt to award less than four years rehabilitative alimony. Certainly Ms. Sampeck's report establishes that taking computer courses should be [a]ppellant's educational goal.

In *Benkin,* the parties were married for twenty-eight years. *Id.* at 203, 524 A.2d 789. The husband earned $70,000 annually. *Id.* at 199, 524 A.2d 789. The wife, age 51, suffered from a severe arthritic condition, and at the time of the divorce earned $11,000 annually. *Id.* at 197–99, 524 A.2d 789. The wife, who was well-educated, had worked as a lobbyist for the first few years of the marriage but, aside from some occasional part-time work, had not been gainfully employed for nearly twenty-five years prior to the divorce. *Id.* at 203, 524 A.2d 789. In *Benkin,* we said:

Appellant, a fifty-one year old woman, virtually inactive in the job market for almost twenty-five years, suffers from arthritis, a progressive condition. She will be fifty-six years old when the alimony award terminates. Reentry into the job market for a woman of fifty-six years, even in excellent health, is problematic. The military pension will begin in about five years and will provide Mrs. Benkin with approximately $400.00 per month. The government pension probably will not begin for ten to twelve years. Although the trial court may not have erred in refusing to award alimony for an indefinite period of time under (c)(1), we find no basis in the record for the five year limitation on alimony under the (c)(2) standard. *On remand, the chancellor should consider and explain explicitly the reasons that favor or*

*militate against an award of indefinite alimony under (c)(2).*

In reaching this outcome, we are not requiring the trial court to order an award of indefinite alimony, although that may be the ultimate conclusion of the trial court, after taking into consideration all the factors that we have set out above. Rather, we hold that there must be some relation between the length of the award and the conclusion of fact as to the income disparity made by the court.

*Id.* at 203–04, 524 A.2d 789 (emphasis added).

Although the disparity in income in *Benkin* was somewhat more severe than here, that case and this one do have as a common denominator the fact that the chancellor failed to explain adequately his reasons for the duration of the rehabilitative alimony award in relation to the disparity of income he found to currently exist, and he failed to explain the factor or factors that militated for or against an award of indefinite alimony.

The chancellor did make it clear that he thought Mrs. Lee would benefit economically if she took some college courses. But he gave no clue as to why he believed Mrs. Lee could be self-supporting in three years (assuming he did have that belief) or what line of work he thought she could engage in to allow her to become self-supporting.

A somewhat similar problem arose in *Long v. Long,* 129 Md.App. 554, 743 A.2d 281 (2000), where the chancellor granted rehabilitative alimony without providing a rationale for its duration. In *Long,* the disparity in income between a couple (who were both fifty-two and who had been married for ten years at the time of the divorce) was much greater than in the case at hand. The husband earned $150,000 annually, but the wife had no job because she suffered from agoraphobia. *Id.* at 565, 743 A.2d 281. The chancellor nevertheless found that the wife had the ability to earn "at least" $25,000 yearly, based on skills she had developed years earlier—but had not used recently. *Id.* at 580, 743 A.2d 281. The court granted the

wife rehabilitative alimony for four years in the amount of $3,000 per month. *Id.* at 581, 743 A.2d 281. In *Long,* we said:

> We take issue with two aspects of the chancellor's findings as they stand. First, his opinion does not tell us why he reached specific findings. For example, *we cannot ascertain from whence his determination on duration of alimony came,* because he does not specifically treat the mandatory factor in section 11–106(b)(2), the time required for Wife to become wholly or partially self-supporting. While our cases hold that the chancellor need not treat section 11–106(b) as a formal checklist and list every factor in his opinion, this element goes to the heart of Maryland's alimony scheme, which is based on rehabilitation. Its absence is especially noticeable because he treated the other factors in some detail. Likewise, the chancellor does not state from what evidence he determined that Wife can *retain* a job earning $2,083.33 per month, *i.e.,* $25,000 per year, given her current and projected mental condition.

> Most of the facts he cited seem to point in the opposite direction of his judgment. A four-year alimony award might make sense, for example, if Wife was mid-degree program and needed time to finish a course of studies, and experts had testified that her anxiety and depression were temporary conditions. The outcome here might make sense if Wife, in sound mental health, had presented the chancellor with a business plan for establishing an auto detailing service or beauty salon with a profit of $25,000 per year projected for the four-year mark. Instead, the findings of fact show that the litigant before us is 52 years of age, has few assets, suffers from a mental health condition with an unknowable prognosis for full recovery, and has been out of the workforce, because of illness and perhaps at Husband's behest, for several years. The record shows, moreover, that she did not end her marriage by choice, but instead is divorced because Husband philandered. The facts of the story as determined by the court below thus do not match the parsimonious award it ultimately granted. *See Benkin v. Benkin,* 71 Md.App. 191, 204, 524 A.2d 789 (1987) ("we

hold that there must be come relation between the length of the award and the conclusion of fact as to the income disparity made by the court"). Because the chancellor failed to draw a solid line between the facts and the remedy, explaining fully how the former justified the latter, he abused his discretion in our view.

*Id.* at 581–83, 743 A.2d 281 (some citations omitted) (emphasis added).

In *Long,* we ultimately concluded that indefinite alimony should be granted because the difference between the "husband's and wife's mid-to-long term [economic] prospects ... [were] ... unconscionably disparate." *Id.* at 583, 743 A.2d 281.

■ This case is analogous to *Long* in some important respects. As in *Long,* the cause of the dissolution of the marriage was due to philandering on the part of the non-dependent spouse. Also, in this case, as in *Long,* the dependent spouse had spent a great deal of the marriage employed only as a homemaker. Lastly, and most significantly, the chancellor in both cases provided an insufficient rationale as to why he selected the period he did for the duration of the rehabilitative alimony.

Unlike appellee, we see no reason to be confident that the three-year period was chosen based upon "Ms. Sampeck's statement that [a]ppellant would greatly increase her marketability by taking some [basic] computer courses." First, the chancellor never mentioned any expectation that Mrs. Lee would take "basic computer courses." In fact, he never once referred to anything in Ms. Sampeck's report in his oral opinion. Second, Ms. Sampeck's suggestion that Mrs. Lee could take some basic computer training would be an exceedingly weak reed upon which to support *any* meaningful prediction as to Mrs. Lee's capacity to improve her income. The expert did not say how long the computer course would last, or what amount of money she might earn if she took the basic course. Third, given the fact that "basic computer skills" are presently found almost universally among persons in the

eighteen to thirty age bracket in this country, it would be virtually impossible for the chancellor to predict whether a person of Mrs. Lee's age could get a better paying job as a result of developing skills so readily found among younger competitors. In our view, this case is like *Benkin* and *Long,* both *supra,* in that the duration of the rehabilitative alimony appears to have been pulled out of "thin air."

And, as will be seen, if the durational aspect of an alimony award is not sufficiently explained, that deficiency makes it difficult to determine whether the factor set forth in FL section 11–106(c)(2) (even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate) has been properly considered.

## B. *Failure to Consider the FL Section 11–106(c)(2) Factor*

Mrs. Lee contends that the chancellor erred when he failed to consider the requirements of FL section 11–106(c)(2). The appellee concedes that the chancellor never considered this factor. Appellee contends, however, that there was no obligation on the chancellor's part to consider the issue of unconscionable disparity of income. According to appellee:

[FL] [s]ection 11–106(a)(1) vests the trial court with the discretion to determine the amount and period of alimony. In order to award alimony, either rehabilitative or indefinite, the court must consider the factors in 11–106(b). *If and when the court decides that an award of indefinite alimony may be appropriate, the court must be able to justify the award by satisfying the criteria under either (c)(1) (age, illness, infirmity or disability) or (c)(2) (unconscionably disparate).* There is nothing in § 11–106 that requires the court to engage in a subsection (c) analysis unless the trial court believes indefinite alimony may be appropriate. The keyword in the statute is "may," and it has been repeatedly held that the failure to award alimony is reviewed by an abuse of discretion standard; "[t]his

Court has affirmed grants of indefinite alimony, and refusals to award indefinite alimony, where a variety of disparities in income exist." *Scott v. Scott,* 103 Md.App. 500, 514, 653 A.2d 1017 (1995). "Our approval or denial of these awards clearly indicates the importance we placed upon the judgment and discretion of the fact finder in evaluating and weighing the evidence and determining all the facts and circumstances in making these very important decisions." *Rock v. Rock,* [86] Md.App. 598, 612, 587 A.2d 1133 (1991). (Emphasis added.)

Before commenting on appellee's argument directly, it is useful to remember that here the chancellor found that at present Mrs. Lee was *not* self-supporting. He found that Mrs. Lee earned, before taxes, $14,400 per year *less* than her annual expenses. And it was undisputed that Mrs. Lee, unlike her spouse, had no health or other fringe benefits connected with her job. Mr. Lee earns $78,000 annually, his employer contributes to a 401K plan, and he has the benefit of company-sponsored health insurance. Even disregarding the economic advantage Mr. Lee has over his wife due to receipt of job-related fringe benefits, currently Mrs. Lee's salary is only 21.5% of Mr. Lee's. It cannot be maintained plausibly that under such circumstances a chancellor's denial of indefinite alimony could be affirmed if he or she did not even consider the issue of unconscionable disparity in incomes.

In ascending order, Maryland cases have found that the chancellor did not err in granting indefinite alimony to a spouse whose potential income, when compared to the non-dependent spouse's income, bore the following percentage relationship: (1) 22.7%—*Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646 A.2d 413 (1994); (2) 25.3%—*Ware v. Ware,* 131 Md.App. 207, 230, 748 A.2d 1031 (2000); (3) 28%—*Tracey v. Tracey,* 328 Md. 380, 392–93, 614 A.2d 590 (1992); (4) 30%—*Digges v. Digges,* 126 Md.App. 361, 388, 730 A.2d 202 (1999); (5) 34%—*Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208 (1983); (6) 34.9%—*Broseus v. Broseus,* 82 Md.App. 183, 196–97, 570 A.2d 874 (1990); (7) 35%—*Bricker v. Bricker,* 78 Md.App. 570, 576–77, 554 A.2d

444 (1989); and (8) 43%—*Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994 (1995).

In all of the above cases, the trial court, at least implicitly, made a prediction as to potential income. Such a prediction was required as shown by *Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 146, 740 A.2d 125 (1999), where we said:

In other words, subsection (2) [of FL section 11–106(c) ] requires a projection into the future, based on the evidence, beyond the point in time when a party may be expected to become self-supporting. It requires a projection to the point when maximum progress can reasonably be expected. *See Blaine v. Blaine,* 336 Md. [49,] 75, 646 A.2d 413 [ (1994) ].

Here, the chancellor made no prediction of what Mrs. Lee would be earning when the rehabilitative alimony period was concluded, nor did he give any indication that he even considered the FL section 11–106(c)(2) factors.

We strongly disagree with appellee's assertions that the law does not require the chancellor to "engage in a section 11–106(c)(2) analysis" in a case like the one at hand. If appellee were correct, a chancellor would never have any way of knowing one way or another whether indefinite alimony is appropriate.

We hold that the lower court erred in not making an on-the-record FL section 11–106(c)(2) analysis.

### C. *Underestimation of the Burden Appellant Would Face if She Attempted to Apply for Indefinite Alimony Three Years Hence*

Appellant argues:

The trial court apparently did not recognize the burden that the [a]ppellant would have in returning three years later for more alimony. The trial court commented at several places in its concluding remarks that an [a]ppellant would merely have to ask the [c]ourt for an extension of alimony, and it would be granted, unless circumstances had radically changed.

In support of this last argument, appellant points to the following statements by the chancellor in his oral opinion:

1. "At this point we're strictly in the rehabilitative alimony stage. This isn't to say that later down the road she could [not] come in and request indefinite alimony, but I don't think we're there yet."

2. "Hopefully this period of rehabilitative alimony will spring the bird from the nest, but we'll have to see. But I do not think that indefinite alimony is appropriate at this time."

3. "[If the court grants rehabilitative alimony,] basically all that means is that for a period time" Mrs. Lee will receive rehabilitative alimony "in the hope[ ] that" she "will better herself in the job market," and at the end of the rehabilitative period she "has a right to come back into court and ask that the rehabilitative alimony be extended or ... converted to indefinite alimony based on the position of the parties."

4. "[W]hatever decision I make here today is not necessarily permanent aside from the fact that ... [the parties] have appeal rights."

Mrs. Lee asserts that what the trial court did in this case was analogous to what was said to be improper in *Thomasian v. Thomasian,* 79 Md.App. 188, 556 A.2d 675 (1989). In *Thomasian,* the dependent spouse had a degree in biology but suffered from a serious eye problem. *Id.* at 193 n. 4, 556 A.2d 675. She was unemployed at the time of the divorce. *Id.* at 193, 556 A.2d 675. The non-dependent spouse, a physician, earned $220,000 annually. *Id.* at 194, 556 A.2d 675. The trial court characterized the testimony concerning Mrs. Thomasian's eye problem as "inconclusive" and ordered that she receive rehabilitative alimony for five years. *Id.* at 193, 556 A.2d 675. He went on to say:

The question of whether or not the plaintiff can make progress toward being self-supporting can be answered during that [five-year] time period. Upon competent medical testimony from a specialist in the field which establishes

the plaintiff's inability to secure employment, the plaintiff may request a further hearing on the issue. . . .

*Id.*

In *Thomasian,* we held:

Although [FL] § 11–107(a) provides a mechanism whereby the period of rehabilitative alimony may be extended, it contemplates an extension based upon some changed circumstances occurring during the period when rehabilitative alimony is being paid. It does not contemplate the situation presented here wherein the court awards the rehabilitative alimony intending that the decision whether it will continue to be rehabilitative or will be changed to indefinite alimony would be finally determined during that period. The trial judge did not cite any authority permitting him to structure the award as he did, and we know of none. Indeed, as we have already pointed out, neither does Mrs. Thomasian; she agrees with appellant insofar as appellant maintains that rehabilitative alimony may not be awarded in lieu of proof of entitlement to indefinite alimony. The matter must be remanded for further proceedings, specifically, for a determination of whether, at this time, Mrs. Thomasian is entitled to indefinite alimony.

*Id.* at 195–96, 556 A.2d 675 (footnote omitted).

Appellee does not directly respond to the issue under discussion. He does point out, however, that in *Blaine v. Blaine,* 336 Md. 49, 65, 646 A.2d 413 (1994), the Court said:

While it may be the case that in the majority of situations an award of indefinite alimony will be made, if at all, at the time of the divorce, it does not automatically follow that indefinite alimony awards must be limited to that time alone.

The *Blaine* Court went on to hold that the alimony statute does give the chancellor the right to reserve the decision as to whether to give alimony in limited circumstances. Quoting *Turrisi v. Sanzaro,* 308 Md. 515, 527, 520 A.2d 1080 (1987), the *Blaine* Court said:

For example, facts before a court may demonstrate no present basis for either rehabilitative or indefinite alimony. But those same facts may show that a highly probable basis for awarding one or the other will exist in the immediate future. Under such circumstances, we see no reason why reservation would be inconsistent with the purposes of the Act. Indeed, under such circumstances, reservation would be consistent with the Act's overall purpose ... to provide for an appropriate degree of spousal support in the form of alimony after the dissolution of the marriage. (citations omitted).

*Blaine,* 336 Md. at 69, 646 A.2d 413.

FL section 11–107 provides:

**Extension of period; modification of amount.**

(a) *Extension of period.*—Subject to § 8–103 of this article, the court may extend the period for which alimony is awarded, if:

(1) circumstances arise during the period that would lead to a harsh and inequitable result without an extension; and

(2) the recipient petitions for an extension during the period.

(b) *Modification of amount.*—Subject to § 8–103 of this article and on the petition of either party, the court may modify the amount of alimony awarded as circumstances and justice require.

We do not believe that the oral opinion in this case can fairly be interpreted as demonstrating that the chancellor thought that after three years Mrs. Lee "would merely have to ask the court for an extension of alimony, and it would be granted, unless circumstances had radically changed ...." As far as we can tell, the chancellor was aware of what would be required of appellant if she later tried to either extend the period of rehabilitative alimony or obtain an award of indefinite alimony.

The real problem, although a closely related one, is that (1) the chancellor evidently believes that Mrs. Lee has the ability

to earn a higher annual salary in the next three years; (2) as a consequence of that belief, he expects that Mrs. Lee will, in fact, increase her income; but (3) the chancellor gave Mrs. Lee no hint as to how much he thought she could earn. If, during the next three years, Mr. Lee's income stayed steady but Mrs. Lee's increased, for instance, to $20,000 annually, even though she diligently tries to earn more, it would be difficult for her to show a change in circumstances that would warrant an award of indefinite alimony, even though her husband still would earn almost four times as much as she. Mrs. Lee might argue that the change in circumstances was that she was unable to earn as much as was anticipated, but such an argument would have doubtful prospects because the chancellor gave no indication as to how much he anticipated she would make.

Mrs. Lee's case status is in marked contrast to that that existed in cases such as *Blaine*, where, contrary to the mutual expectations held by the parties when rehabilitative alimony was granted, the dependent spouse was unable to obtain a job in the field for which she was pursuing her master's degree, thereby justifying an award of indefinite alimony at the conclusion of the rehabilitative alimony period. *See Blaine,* 336 Md. at 59–60, 646 A.2d 413. Because she does not know even approximately how much the court expected her to earn, Mrs. Lee, unlike the dependent spouse in *Blaine,* would find it virtually impossible to show a change in circumstances that would warrant indefinite alimony. *See also Turner v. Turner,* 147 Md.App. 350, 809 A.2d 18 (2002)("In other words, without any finding by the court of some amount of anticipated investment earnings, we do not know how the court determined to award monthly alimony of $2,000.").

### D. *Indefinite Alimony*

■ Mrs. Lee's penultimate argument is that the chancellor erred, as a matter of law, in not granting her indefinite alimony. Appellee counters by pointing out that trial courts are afforded broad discretion in deciding the duration and the amount of alimony and that appellate courts seldom second-

guess the exercise of that discretion. Citing, *inter alia, Rock v. Rock*, 86 Md.App. 598, 612, 587 A.2d 1133 (1991). Mr. Lee asserts that under the circumstances of this case no abuse of discretion has been demonstrated.

In support of his argument, appellee says that the record reveals that Mrs. Lee is "capable of earning $24,804 annually"; that upon sale of the house and distribution of marital property she "will receive $148,000.00 [sic]," plus a vehicle worth in the "$9,000 to $12,000 range," and can work full time. Appellee further asserts that the facts here are analogous to those in *Scott v. Scott*, 103 Md.App. 500, 653 A.2d 1017 (1995).

In *Scott*, the total value of all marital property was $513,711.11. *Id.* at 516, 653 A.2d 1017. At the time of divorce, the wife, age 39, was healthy and had a ten-year career with the University of Maryland as "an extension adviser." *Id.* at 507, 514, 653 A.2d 1017. She earned $27,500 yearly and had a "vested pension" and a master's degree. *Id.* The husband earned "approximately $72,000," plus bonuses,[3] annually. *Id.* Both parties owned "substantial" non-marital property. *Id.* at 506, 653 A.2d 1017. Marital property titled solely in the wife's name ($30,765.90), plus her share of marital property held in joint names, gave the wife $161,833.46 of marital property (31.5%). *Id.* at 516, 653 A.2d 1017. The difference in the husband's share of marital property from the wife's was equal to $190,068.19, although, through a mathematical error, the chancellor thought the difference was $220,068.19. *Id.* The wife was given a marital award in the amount of $100,000; however, that portion of the judgment was remanded due to the aforementioned math error. *Id.* In *Scott*, the chancellor awarded the wife $100 per week alimony for five years, $1,209 per month child support, and 35% share of her husband's pension "if, as, and when" the husband received it at age 65—but denied indefinite alimony.[4] *Id.* at

---

**3.** The amount of Mr. Scott's bonus was not mentioned in the *Scott* opinion.

**4.** The chancellor in *Scott* determined that the wife would receive 35% of the husband's monthly pension of $1,696.41. *Id.* at 519, 653 A.2d

519, 653 A.2d 1017.  Under those circumstances, we held that the trial court did not abuse its discretion in failing to award indefinite alimony.  *Id.* at 514, 653 A.2d 1017.

The *Scott* case is distinguishable from the case *sub judice* in several respects.  Mrs. Scott was much younger, better educated, and richer than Mrs. Lee.  Mrs. Scott was regularly employed for ten years with the same employer prior to the divorce and earned over 50% more annually than does Mrs. Lee.  And, Mrs. Scott, unlike Mrs. Lee, received a substantial monetary award.  Also, even without the monetary award, Mrs. Scott had pension rights through her employment, plus jointly owned marital and non-marital property that far exceeded the value of the property owned by Mrs. Lee.  Lastly, although Mr. Scott earned about the same annual income as does Mr. Lee, his $72,000 yearly income, after paying child support, was reduced to only $55,492.

Mrs. Lee will have only $86,000 in readily accessible assets after the sale of the marital home.  The remaining $60,000 will be reserved for her retirement.  Unless she elects to rent a house for the remainder of her life, a large portion of the $86,000 will be used as a down payment on a new dwelling. She will therefore have little money to invest.

Even if appellee is correct and Mrs. Lee can earn $24,804 annually, that salary would be less than one-third of what appellee earns and that amount is far less than her annual legitimate expenses (*i.e.,* $31,500—as found by the chancellor). And, given the realities of today's employment market, it is doubtful that a woman of Mrs. Lee's education and age will be able to get a job in Western Maryland paying health insurance benefits or retirement benefits.

The evidence in this case is strong enough to approach—but not quite reach—the point where we can say that Mrs. Lee, as a matter of law, is entitled to an award of indefinite alimony.

---

1017.  The *Scott* Court pointed out that the percentage of the husband's pension to which the wife was entitled could not be ascertained until the number of years of the husband's employment was known.  *Id.*

One missing ingredient—as already mentioned-is that we do not know what the lower court's thought process was in regard to the factors set forth in FL section 11–106(c)(2). Under these circumstances, we shall remand this case, with instructions for the court to (1) say whether it thinks Mrs. Lee has the ability to be wholly self-supporting; (2) predict, based on the evidence already presented—or, if needed, additional evidence—the amount Mrs. Lee could reasonably be expected to earn; (3) discuss fully the factor set forth in FL section 11–106(c)(2); and (4) decide, taking into consideration what we have said, whether an award of indefinite alimony is justified and, if so, the amount.

**JUDGMENT INSOFAR AS IT RESTRICTS ALIMONY TO A PERIOD OF THREE YEARS VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR WASHINGTON COUNTY FOR FURTHER ACTION IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION; JUDGMENT OTHERWISE AFFIRMED; COSTS TO BE PAID BY APPELLEE.**